UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ACCADIA SITE CONTRACTING, INC.,

                             Plaintiff,

      vs.                                    Civil Action No.: 1:14-cv-341

NORTHWEST SAVINGS BANK,

                             Defendant.

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

                                                                          Page

PRELIMINARY STATEMENT ..................................................................   1

FACTUAL HISTORY .............................................................................   2

ARGUMENT............................................................................................   2

POINT I

    THIS ACTION IS NOT UNTIMELY IN ITS ENTIRETY
    BECAUSE THE DAAD IS NOT ENFORCEABLE AND EVEN
    IF IT IS, PORTIONS OF THIS ACTION ARE TIMELY UNDER
    THE 60-DAY LIMITATIONS PERIOD...............................................   3

    A. The Limitations Period Under the DAAD is not Enforceable
       Against Accadia Because Accadia did not Assent to the DAAD .....................   4

      1. Defendant has not Established That Accadia Assented to
         the DAAD Because It has not Established That Accadia
         Received the DAAD or was Given Sufficient Notice of the
         DAAD Before Opening an Account...............................................   4

         i.  Defendant has not Established Actual Receipt of DAAD ....................   5

         ii. Defendant is not Entitled to the Presumption of Receipt ...................   9

         iii. Defendant has not Established Inquiry Notice ......................................   12

      2. Defendant has not Established That Accadia Assented to the
         DAAD Because the EDA Does not Make the DAAD Enforceable ............   16

    B. Even if the DAAD is Enforceable, This action Cannot be Dismissed
       in Its Entirety because Questions of Fact Exist With Respect to
       Whether Accadia's Notice to Defendant was Sufficient ...................................   20

POINT II

    ACCADIA'S ALLEGED NEGLIGENCE CANNOT BE A BASIS
    FOR SUMMARY JUDGMENT BECAUSE DEFENDANT HAS NOT
    ESTABLISHED THIS NEGLIGENCE OR THAT IT ACTED IN
    ACCORDANCE WITH "REASONABLE COMMERCIAL
    STANDARDS" AS A MATTER OF LAW .........................................   21

CONCLUSION.........................................................................................   25

## PRELIMINARY STATEMENT

This motion is nothing more than a bank — defendant — asking this Court to fix its mistakes that have resulted from it playing fast and loose with a buffet of formulaic, adhesion "agreements." Defendant wants this Court to fill in the blanks with regard to what it and plaintiff Accadia Site Contracting, Inc. ("Accadia") intended as the terms of Accadia's account. A prime example of the bank's carelessness and audacity in this respect is how the bank is attempting to use the adhesion "agreement" that is at the center of this motion — the "Deposit Account Agreement and Disclosure" (the "DAAD")[1] — without any meaningful legal analysis on whether it even is enforceable in the first place. Specifically, the DAAD was not included among the litany of other agreements that were specified on the application that Accadia signed to open its account, but defendant nevertheless wants this Court to find that the parties "really" intended for the DAAD to be included on that application. In fact, the DAAD was not specified by name on any agreement, application, or other document that Accadia signed. Moreover, the evidence supports that defendant did not even have a reliable, concrete policy in place to ensure that its customers received the DAAD.

Defendant's carelessness does not end there, however, but it continued with how it administered Accadia's accounts. In particular, this carelessness is evinced by the undisputed facts that Ms. Gramza walked into defendant's branch office, that defendant permitted her to cash over $630,000 in checks, that these checks were made payable to Ms. Gramza herself, that these checks were drawn against Accadia's operating — not its payroll — account, that these

---

[1] In its brief, defendant refers to the DAAD as the "DDA" without any explanation as to how the "DDA" is an acronym for a document that is entitled the "Deposit Account Agreement and Disclosure." This is yet another example of defendant's carelessness in using broad, ambiguous, vague, and unspecific terms to refer to what it claims to be an all-important document.

checks bore a signature that obviously was from a signature stamp, and that defendant often

permitted her to cash thousands of dollars' worth of checks in this manner at multiple times in

the same week! More importantly — and troubling — is that defendant did not even pick up the

phone to call Mr. Marinaccio at any time during the three-plus years that this was occurring.

One does not need to be a banking expert to know that this is highly negligent conduct, which, as

discussed below, cannot be disclaimed under a contract. Nevertheless, whether or not defendant

was negligent and whether or not Accadia assented to the DAAD cannot be determined on this

motion. Thus, Accadia respectfully is requesting that this Court deny this motion in its entirety.

## FACTUAL HISTORY

The relevant factual history of this action is discussed in Plaintiff's Response To

Defendant's Statement of Material Facts and in Opposition to Defendant's Renewed Motion for

Summary Judgment Pursuant to L.R. Civ. Pro., R. 56(a)(2), dated July 22, 2016, including the

Plaintiff's Appendix to Its Responding Statement of Material Facts ("Pl.'s App.").

## ARGUMENT

When, reviewing a motion for summary judgment, the court will "resolve all

ambiguities and draw all reasonable inferences in the non-movant's favor." *E.g., Vt. Teddy Bear

Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Here, defendant argues that

the 60-day limitations period under the DAAD and Accadia's own negligence bar this action.

When resolving all ambiguities and drawing all inferences in Accadia's favor, however,

summary judgment cannot be granted because questions of fact exist on these issues. Questions

of fact exist on these issues because the evidence supports that Accadia never assented to the

DAAD, that Accadia nevertheless gave sufficient notice to defendant under the DAAD, that

Accadia was not negligent, and that defendant did not act in a commercially reasonable manner.

As a result, this Court should not resolve these issues as a matter of law on this motion.


## POINT I

## THIS ACTION IS NOT UNTIMELY IN ITS ENTIRETY BECAUSE THE DAAD IS NOT ENFORCEABLE AND EVEN IF IT IS, PORTIONS OF THIS ACTION ARE TIMELY UNDER THE 60-DAY LIMITATIONS PERIOD.

A bank and a customer can agree to shorten the one-year statutory period for an

action based on a forged or unauthorized check, but this agreement is enforceable only if it is

valid under the usual contract-formation analysis.  N.Y. U.C.C. § 4-406(4) (McKinney's 2016);

*see also Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11-12, 537 N.Y.S.2d 787, 792 (1988);

*Gluck v. JP Morgan Chase Bank*, 12 A.D.3d 305, 306, 785 N.Y.S.2d 77, 78 (1st Dep't 2004);

*Monreal v. Fleet Bank*, 95 N.Y.2d 204, 209, 713 N.Y.S.2d 301, 304 (2000) (the one-year period

is applicable even when the same wrongdoer repeatedly commits the forgeries).[2]  Moreover,

even if enforceable, any ambiguities in a contract must be strictly construed against the drafter.

*E.g.*, *Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476,

482 (2d Cir. 1985).  Here, this action is timely because Accadia's assent to the DAAD cannot be

determined as a matter of law and even if it is, portions of this action are timely because Accadia

gave sufficient notice to defendant within 60 days of receiving its statement.

---

[2]  Even though defendant initially argues that this action is untimely under the one-year period, defendant abandons this argument and focuses only on the abbreviated period under the DAAD (Dkt. No. 44 at 14, 17, 21).  Nevertheless, a significant portion of this action is timely under the one-year period.  Assuming, arguendo, that the October 10, 2013 letter was the first notice that Accadia provided to defendant, then this action is timely as it pertains to the $212,181.84 in forged drafts that were reflected in bank statements that Accadia received subsequent to October 10, 2012 because this is one year prior to the October 10, 2013 letter.

A.     The Limitations Period Under the DAAD is not Enforceable Against Accadia
       Because Accadia did not Assent to the DAAD.

Simply put, Accadia never assented to the DAAD before it opened an account

with defendant, and this lack of assent is not remedied by the Express Deposit Agreement (the

"EDA") because the EDA does not incorporate the DAAD.  Generally, for any contract to be

enforceable, "there must be a manifestation of mutual assent sufficiently definite to assure that

the parties are truly in agreement with respect to all material terms."  *E.g.*, *Tractebel Energy*

*Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Express Indus. & Terminal*

*Corp. v. N.Y. State DOT*, 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 860 (1999)).  To determine

whether mutual assent or a meeting of the minds exists, courts often "look to the basic elements

of the offer and the acceptance."  *Robison v. Sweeney*, 301 A.D.2d 815, 816, 753 N.Y.S.2d 583,

584 (3d Dep't 2003).  Of course, "an offeree cannot actually assent to an offer unless the offeree

knows of its existence . . . [and] [a]n offer — and all of its terms — therefore ordinarily precede

acceptance."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012).  Here, the evidence

does not establish Accadia's assent as a matter of law because: (1) it does not establish sufficient

receipt or notice of the DAAD prior to Accadia's assent to open an account with defendant and

(2) the EDA does not sufficiently incorporate the DAAD by reference.

1.     Defendant has not Established That Accadia Assented to the DAAD
       Because It has not Established That Accadia Received the DAAD or was
       Given Sufficient Notice of the DAAD Before Opening an Account.

Generally, no mutual assent exists if the offeree is not made aware of the terms of

a contract before supposedly giving acceptance.  *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110,

121 (2d Cir. 2012).  To establish a customer's assent to a form document, a bank must prove

-4-

either that the customer actually received the document, that the bank is entitled to the

presumption that the client received the document, or that the client was given sufficient inquiry

notice of the document. *Romanov v. Citibank, N.A.*, 2014 U.S. Dist. LEXIS 83534 at 31-53

(S.D.N.Y. June 10, 2014).  Here, defendant has not proven and cannot prove these requirements.

    i.  <u>Defendant has not Established Actual Receipt of the DAAD</u>.

    In *Romanov v. Citibank, N.A.*, 2014 U.S. Dist. LEXIS 83534 at 1-2 (S.D.N.Y.

June 10, 2014), the District Court for the Southern District of New York held that a form

agreement — a client manual — that included a clause requiring arbitration was not enforceable.

The plaintiffs were customers of the defendant-bank who had signed up for a credit card that the

bank was offering and that featured travel rewards. *Id.* at 2.  After about a year and a half of

using their accounts, the plaintiffs commenced the action against the bank over a dispute about

the terms of their credit-card accounts. *Id.*  The bank moved to enforce an arbitration clause in a

client manual, which it alleged was provided to the plaintiffs when they opened their accounts.

*Id.* at 2, 30-31.  Thus, the issue that ultimately was before the court was whether the bank had

proven that the plaintiffs had assented to the terms of the client manual when they opened and

continued to use their accounts with the bank. *Id.* at 1-2, 30-31.

    The court examined depositions and hearing testimony that was taken on this

issue to reach its holding. *Romanov*, 2014 U.S. Dist. LEXIS 83534 at 3-27.  In particular, the

bank's senior vice president, manager of a branch office, and three personal bankers testified.

*Id.* at 3-16, 20-25.  Even though these employees testified that the bank had a "uniform" policy

to provide customers with a copy of the client manual upon account opening and that this policy

"was followed consistently," none of the bank's employees had any personal recollection of providing the plaintiffs with the client manual. *Id.* at 4, 9, 30. Also, the bank did "not require a signature to indicate receipt of the Client Manual, Marketplace Addendum, or an agreement." *Id.* at 16, 24. More importantly, all but one of the bank's employees testified that the manual would not have been provided to the customers until after they signed the signature card, which was used to signify their assent to opening an account. *Id.* at 8, 12, 14, 21. Other than a generic statement that the customer was accepting all terms of the account, the signature card made no reference and did not indicate any connection to the manual whatsoever. *Id.* at 5-6, 21-22.

Moreover, the customers were not given sufficient notice of the significance of the client manual because none of the employees explained any part of the manual in any detail with the customers unless the customers had questions. *Romanov*, 2014 U.S. Dist. LEXIS 83534 at 6, 9, 12, 15, 20-21. Instead, the employees merely informed the customers that "the Client Manual contains information about the account." *Id.* Specifically, all of the bank's employees were unfamiliar with the concept of arbitration. *Id.* at 6, 9, 12, 15, 26. The failure to review the terms of the client manual with the customers also was significant because it constituted a deviation from the bank's policy according to an account-opening checklist, which required employees to "review" the terms of the client manual with the customer. *Id.* at 40-41.

Although each of the plaintiffs denied receiving the client manual when they opened their accounts, it was referenced in one of the documents that one plaintiff admitted receiving when opening his account. *See Romanov*, 2014 U.S. Dist. LEXIS 83534 at 17-19, 25. Furthermore, the plaintiff did not "ask anyone for a copy of [an agreement governing the

account], despite the statement on the signature card stating that 'by signing below, I . . . agree to be bound by any agreement governing any account opened in the title indicated on this card.'" *Id.* at 26-27.  Additionally, even though the plaintiff's monthly statements instructed him to "refer to your Citibank account terms and details, . . . he never requested them." *Id.* at 27. Basically, "he never inquired about the terms and conditions of the accounts." *Id.* at 18. Likewise, "[e]ven after receiving monthly account statements in the mail, [the other plaintiff] never requested a copy of the Client Manual . . . or other account documents." *Id.* at 19.

Nevertheless, based on the evidence that was before the district court in *Romanov*, the court held that the client manual was not enforceable because the bank had not established that the plaintiffs sufficiently assented to the terms of the manual. *Romanov*, 2014 U.S. Dist. LEXIS 83534 at 14.  With respect to actual receipt, the bank attempted to rely on its policy that the "[p]laintiffs could not have signed the signature cards without also receiving the Client Manual at the time they opened their Accounts." *Id.* at 32.  The court, however, rejected this argument and held that the bank had not proven actual receipt because "[t]he signature card . . . does not establish receipt of the Client Manual[] [because] as the card makes no mention of the document[,] . . . [and] not a single employee utterance provides a connection between the signature card and the Client Manual sufficient to demonstrate actual receipt." *Id.* at 32-33. Instead, the signature card "merely establishes . . . that Plaintiffs are bound by 'any' un-referenced agreement." *Id.*  Also, no bank employee had any personal recollection of providing the plaintiffs with a copy of the manual. *Id.* at 30.

Here, defendant cannot establish actual receipt of the DAAD by Accadia for the same reasons that the bank in *Romanov* could not prove actual receipt. First and foremost, like the employees in *Romanov*, neither Ms. Harenda nor Ms. Panaro have testified or averred that they have any personal recollection that the DAAD was given to Accadia (Pl.'s App., Ex. B at 80:16-20, 81:15-18; *see also* Affidavit of Linda Panaro, sworn to on May 28, 2014, Dkt. No. 41 (the "Panaro Affidavit" or "Panaro Aff."), Reply Affidavit of Linda Panaro, sworn to on June 25, 2014, Dkt. No. 42 ("Panaro Reply Aff.")). Additionally, like the signature pad in *Romanov* that did not contain any terms that confirmed receipt of the client manual, defendant has not proven actual receipt of the DAAD because the documents that it relies on do not contain any terms that confirm receipt of the DAAD (*id.* at 33:3-6, 46:23-47:1-3; Panaro Aff., Exs. A, B). Specifically, Accadia signed an application, resolution, and a signature pad, but none of these documents reference the DAAD (*id.*). A plain reading of the application and the resolution establishes that they do not make any reference to the DAAD (Panaro Aff., Exs. A, B).[3]

With respect to the signature pad, defendant has not submitted any proof that it confirms receipt of the DAAD (*see* Pl.'s App., Ex. B at 23:7-24:7, 47:19-23). In particular, like the testimony from the bank employees in *Romanov*, Ms. Harenda testified that she did not know if the signature pad was "linked" to the DAAD or if the signature pad distinguished the customer's assent to the DAAD from other agreements (*id.*, Ex. B at 55:16-21). In fact, Ms. Harenda's testimony supports that the DAAD was not linked to the signature pad because

---

[3] In Ms. Panaro's reply affidavit, she attaches the same application from her initial affidavit, but tacks on an additional document entitled "Business Online Banking Agreement" and asserts that this "agreement" — which also is unsigned, undated, and lacks any wording that connects it to Accadia — also governed Accadia's accounts (Panaro Reply Aff., Ex. A). This is yet another example of defendant's carelessness, which should not be corrected or excused by this Court.

-8-

she testified that the DAAD would print without the customer signing the pad, but that the customer had to sign the pad for other documents to print (*id.*, Ex. B at 53:8-15). Therefore, defendant is attempting to establish actual receipt of the DAAD by relying solely on its purported policy and the allegation that Accadia could not have opened its accounts if it had not received the DAAD (*id.*, Ex. B at 43:10-20, 81:4-18; Panaro Reply Aff. ¶¶ 4-6). As the court in *Romanov* held, however, this proof alone is insufficient to establish actual receipt.

ii.   <u>Defendant is not Entitled to the Presumption of Receipt</u>.

Returning to the district court's decision in *Romanov*, the court also rejected the bank's attempt to establish presumptive receipt of the client manual based on the bank's policy for account openings and the manual. *Romanov v. Citibank, N.A.*, 2014 U.S. Dist. LEXIS 83534 at 34-45 (S.D.N.Y. June 10, 2014). As an initial matter, the court held that the bank had established a policy through the testimony of its vice president and two documents that described that policy — a "'Personal Bankers Foundation' manual" and a "Customer Care Checklist." *Id.* at 35-36. Moreover, the court acknowledged that the plaintiffs' mere denial of receipt of the manual was not sufficient to defeat the presumption that arose as a result of the policy. *Id.* at 39.

Nevertheless, the court held that the bank was not entitled to the presumption because the evidence did not establish that the bank's employees consistently followed its policy. *Romanov*, 2014 U.S. Dist. LEXIS 83534 at 45. The court held that "'a claim of no receipt,' coupled with evidence tending to 'show[ ] that routine office practice was not followed or was so careless that it would be unreasonable to assume that the notice was mailed,' will negate any such presumption." *Id.* at 40 (quoting *Youxin Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

-9-

597 F.3d 84, 92 (2d Cir. 2010) and *Nassau Ins. Co. v. Murray*, 46 N.Y.2d 828, 830,

414 N.Y.S.2d 117, 118 (1978)).  Specifically, the court reasoned that the bank's employees did

not follow the policy because they did not review the terms of the accounts with the customer,

which was required under the checklist.  *Id.* at 40-41.  The court held that merely reviewing

terms only when the customers had questions did not constitute affirmatively reviewing these

terms as required by the checklist.  *See id.*  With respect to the arbitration clause in particular, the

bank's employees did not even have sufficient knowledge to explain that clause.  *See id.*

Defendant's argument here regarding its purported policies is even more tenuous

than the bank's loosing argument in *Romanov* because defendant has not even presented any

evidence that supports that it had a sufficient, reliable policy in the first place.  In particular,

neither of the affidavits from Ms. Panaro refers to any specific policy for account openings

(*see* Panaro Aff. ¶ 7; Panaro Reply Aff. ¶ 4).  Unlike the bank in *Romanov*, Ms. Panaro does not

refer to or provide any document that evinces any such policy, including not providing any

checklist that serves as a guide for account openings (*see* Panaro Aff.; Panaro Reply Aff.).

Specifically, defendant has not even produced the "basic procedure document" that allegedly

existed in 2010 when Accadia opened its accounts (*see id.*; *see also* Pl.'s App, Ex. B. at 18:14-

19:15).  Instead, Ms. Panaro merely avers that defendant "provides the DAAD to all customers in

the ordinary course of business," which — unlike the specific, documented policies that the bank

had in *Romanov* — is too arbitrary and vague to establish the type of reliable policy that can

support an inference that a document as important as the DAAD was provided to Accadia

(Panaro Aff. ¶ 7; Panaro Reply Aff. ¶ 4).  This purported policy is too arbitrary, vague, and

unreliable because it does not include any specific, concrete steps for account openings (*see id.*).

Likewise, Ms. Harenda's testimony was too unspecific and vague to establish any policy (Pl.'s App., Ex. B at 33-34).  Specifically, her testimony about defendant's purported policy merely was that she would "collect any documents that are needed," "input all the information," "print all the documents," "go over them with the customer," and give "that" to the customer (*id.*, Ex. B at 33:16-23).  Moreover, Ms. Harenda's testimony about defendant's policy is unreliable because it was inconsistent and confusing.  For example, after claiming that Accadia had signed signature cards and claiming to have reviewed these cards in preparation for her testimony, Ms. Harenda admitted that no signature cards, in fact, existed with respect to Accadia's account because they had been discontinued before she began working for defendant (*id.*, Ex. B at 20:1-8, 23:9-12, 27:11-16).  Also, Ms. Harenda testified that her classroom or online training for her personal-banker position did not even address what documents had to be provided to customers at the time of account opening (*id.*, Ex. B at 13:14-17).  Instead, Ms. Harenda claimed that she relied on "one-on-one" training, but failed to specify any documents that she was instructed to provide at account openings during this training (*id.*, Ex. B at 13:18-14:10).  Therefore, without even addressing whether defendant consistently followed a policy, it has not established the existence of any policy that is specific enough to rely on for the presumption that Accadia received the DAAD.

Even assuming, arguendo, that defendant established a specific policy, it has not established that this policy consistently was followed because a significant inconsistency exists in the Panaro affidavits and Ms. Harenda's testimony.  Although Ms. Panaro avers that "[t]he DAAD is . . . reviewed with every customer at new account opening[sic]," Ms. Harenda's testimony contradicts this because she testified that the terms of the DAAD were not reviewed at

-11-

all (Panaro Reply Aff. ¶ 6; Pl.'s App., Ex. B at 69:1-4). Specifically, when asked "do you go

over any of the individual terms or point anything out to the customer," she simply answered

"[n]o" (*id.*). Instead, Ms. Harenda claims that she gives a description of the DAAD that consists

solely of a vague, conclusory characterization that it is "a legal, binding agreement"

(*id.* at 68:21). Besides being an incorrect legal conclusion, this description does not provide any

meaningful explanation of the terms in the DAAD. The failure to review the terms of the DAAD

is the same departure from the policy that was at issue in *Romanov*, which the court in *Romanov*

held to be fatal to the presumption of receipt. Thus, due to the vagueness and ambiguous nature

of defendant's purported policy and the conflicting testimony regarding whether that policy was

followed, defendant's proof is not sufficient to establish presumptive receipt of the DAAD.


iii.     Defendant has not Established Inquiry Notice.

        The district court's decision in *Romanov* also is instructive on inquiry notice. In

*Romanov*, the court rejected the bank's attempt to establish that the plaintiffs were put on inquiry

notice of the client manual. *Romanov v. Citibank, N.A.*, 2014 U.S. Dist. LEXIS 83534 at 46-53

(S.D.N.Y. June 10, 2014). Basically, the bank's argument on this point was that "[t]he Court

should attribute to Plaintiffs receipt of the Client Manual . . . because they were given notice of

its existence at the account opening and at times thereafter." *Id.* at 46. The court rejected this

argument on two grounds. *Id.* at 46-53. The first ground was that the contractual nature of the

client manual was not conspicuous. *Id.* at 46-50.


        Notwithstanding this first ground, the court held that the bank's "notice argument

also fails because Citibank's employees indicated that they provide Client Manuals to clients

only *after* clients sign the signature card." *Romanov*, 2014 U.S. Dist. LEXIS 83534 at 50

(emphasis in original).  In its reasoning, the court quoted the Second Circuit's decision in

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123n.14 (2d Cir. 2012), by commenting that:

> Even "had the [Client Manual] more clearly indicated that it contained an
> arbitration clause, the fact that it was delivered after enrollment and did not
> require any affirmative acknowledgment of receipt . . . undermines [the bank's]
> assertion that the plaintiffs received sufficient notice to bind them to the
> additional terms through their inaction." *Id.* at 51.

Thus, "[t]he record [was] clear that [the] Parties did not bargain for . . . an arbitration clause

before their apparent assent[] [because] '[a]s a general principle, an offeree cannot actually

assent to an offer unless the offeree knows of its existence[]' . . . [and] '[a]n offer — and all of its

terms — [must] ordinarily precede acceptance'" *Id.* (quoting *Schnabel*, 697 F.3d at 121).


Likewise, in rejecting the bank's notice argument on this ground, the court also

placed significance on the fact that the bank's employees do not explain the importance of the

signature cards at the time that they had the plaintiffs sign. *Romanov*, 2014 U.S. Dist. LEXIS

83534 at 51.  Again, the language on the signature card referred to a generic "agreement"

because it merely provided that "[b]y signing below I . . . agree to be bound by any agreement

governing any account opened in the title indicated on this card." *Id.* at 4n.3, 5.  Thus, the card

did not include a specific reference to the client manual, and the bank's witnesses "offered

nothing that connects the signature card to the Client Manual." *Id.* at 4n.3, 5, 6, 21-22.

Moreover, the fact that at least one plaintiff was provided with a document that specifically

referenced the client manual was not sufficient to establish inquiry notice. *See id.* at 26-27, 46-

53.  Therefore, the Court held that the bank had not established inquiry notice because it was

"'not persuaded that a reasonably prudent offeree in these circumstances would have known of

-13-

the existence of' *an arbitration clause*." *Id.* at 46 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31 (2d Cir. 2002)) (emphasis added) (the court placed emphasis on the need to give notice of the "arbitration clause" in particular, as opposed to mere general notice of the manual).

Here, analogous to *Romanov*, defendant cannot establish inquiry notice for three reasons. First, like in *Romanov*, Ms. Harenda's testimony establishes that customers were not provided with the DAAD until after they had signed the application, resolution, and signature pad (Pl.'s App., Ex. B at 32:9-16, 51:23-52:9, 54:2-21, 55:2-10, 64:22-65:3, 67:17-68:9). Specifically, Ms. Harenda responded in the affirmative when she was directly asked whether customers are asked to agree to and to sign for something — the DAAD — that the customer has not even seen yet (*id.*). Also, like in *Romanov*, no document that Accadia signed included language that conveyed that it was agreeing to the terms of the DAAD because nothing referenced the DAAD or gave any other indication that the DAAD even existed (pp. 8-9 supra).

Second, as discussed above, Ms. Harenda's testimony reveals that she did not give any meaningful explanation of the terms of the DAAD before the customers would sign the signature pad and the resolution (Pl.'s App., Ex. B at 69:1-4). In particular, Ms. Harenda never explained the customer's obligations with respect to reviewing account statements and fraudulent or unauthorized checks (*see id.*). Instead, Ms. Harenda gave only a vague, conclusory explanation because she allegedly told customers that the DAAD was a legal, binding contract without even providing them with a copy of it (*id.*, Ex. B at 46:19, 68:21). Thus, like in *Romanov*, given the significance of this particular provision of the DAAD, defendant's failure to

-14-

review its terms with customers before they assented to opening an account especially is careless and especially is fatal to Accadia's alleged assent to those terms.

Third, like the inconspicuous reference in the document that the plaintiff signed in *Romanov*, the EDA does not establish Accadia's assent to the DAAD because defendant has not offered any proof that it provided Accadia with the DAAD before it signed the EDA.  Hence, as the court held in *Romanov*, "[e]ven 'had the [EDA] more clearly indicated that [the DAAD] contained an arbitration clause, the fact that it was delivered after enrollment and did not require any affirmative acknowledgment of receipt . . . undermines [defendant's] assertion that [Accadia] received sufficient notice to bind [it] to the additional terms through [its] inaction.'" Nevertheless, the EDA does not even reference the DAAD by its full and correct title and mostly incorporates only certain aspects of the DAAD (Panaro Reply Aff., Ex. C at 1, 2, 4, 11 (¶¶ 1, 3, 8, 10, 12, 33)).  In fact, the only provision of the EDA that arguably may incorporate the DAAD in its entirety is paragraph 33,[4] but this provision is insufficient for the same reasons that the signature pad, the resolution, and the documents in *Romanov* were insufficient — which is that it refers only to generic "Agreement(s)" (*id.*, Ex. C at 11 (¶ 33)).  Thus, the evidence establishes that Accadia did not assent to the DAAD because if it was provided with the DAAD, this was not until after it assented to opening the account by signing the signature pad and the resolution.

---

[4] Paragraph 33 is the only provision of the EDA that defendant can rely on to incorporate the "Account Statements" paragraph of the DAAD because the other provisions where the DAAD allegedly is referenced are limited to certain terms or conditions that do not address Accadia's duties with respect to reviewing and disputing in-person withdrawals (Panaro Reply Aff., Ex. C at 1, 2, 4, 7 (¶¶ 1, 3, 8, 10, 12(a), 18)).

In sum, defendant has not established that Accadia's assent to the DAAD because the evidence does not establish actual receipt, presumptive receipt, or inquiry notice. Like in *Romanov*, the mere fact that Accadia continued to use its account does not alone establish that it assented to the DAAD because defendant has not proven that Accadia ever received or was put on notice of the DAAD or its terms. Given the significance and materiality of the DAAD, defendant's argument that Accadia assented to it is undermined by the facts that it is not signed, no document explicitly confirms that it was provided to Accadia or that Accadia agreed to it, and defendant has not even produced the completed DAAD that allegedly was given to Accadia. Under these circumstances and given defendant's extreme carelessness, this Court should not retroactively incorporate the DAAD into the parties' agreement.

> 2.      Defendant has not Established That Accadia Assented to the DAAD
>         Because the EDA Does not Make the DAAD Enforceable.

The EDA does not make the DAAD enforceable against Accadia because the EDA does not specifically reference the DAAD and defendant has not established that Accadia assented to the DAAD as a separate, distinct agreement. Under New York law, two elements must be met in order to rely on the "incorporation-by-reference" doctrine to enforce a contract on the basis that it was referred to in another contract. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996). These two elements are: (1) "that the paper to be incorporated . . . must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt" and (2) "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id.*; *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995); *Ryan, Beck & Co., LLC v. Fakih*, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003); *Federated Mut. Ins. Co. v. Woodstock '99 LLC*, 140 F. Supp. 2d 225, 228 (N.D.N.Y. 2001).

-16-

With respect to the first element, whether "the [incorporated document] was referred to or described in the [incorporating document] such that it could be identified beyond all reasonable doubt" generally constitutes a question of fact that precludes summary judgment. *Chiacchia v. Nat'l Westminster Bank*, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888, 890 (2d Dep't 1986). For example, in Chiacchia, the plaintiff commenced an action against a bank arising out of the theft of $50,000 from her safe-deposit box, which occurred when the plaintiff permitted her "estranged husband" to access the box. *Id.* at 627. When the plaintiff first rented the box from the bank, she signed a rental agreement that provided that she agreed to the "rules and regulations of the bank." *Id.* One rule in a document — entitled "Rules for Your Safety Deposit Box Service" — was that cash should not be stored in the box. *Id.* The trial court granted the bank's motion for summary judgment on the basis of that rule being incorporated into the rental agreement that the plaintiff had signed, but the Second Department reversed. *Id.* at 628. The Second Department reasoned that the plaintiff's assent to that rule could not be determined as a matter of law because the rental agreement did not reference the full title of the document that included the rule, but, instead, generically referred only to "rules." *Id.*

Turning to the second element of the incorporation-by-reference doctrine, the party that is attempting to establish enforceability must establish the other party's assent to the referenced contract even if the first element is met. *Torres v. Major Auto. Grp.*, No. 13-CV-0687 (NGG) (CLP), 2014 U.S. Dist. LEXIS 136292 at *32 (E.D.N.Y. Sep. 24, 2014). For example, in *Torres*, the plaintiff was a salesman who sued the car dealership that he worked for on the basis of an alleged breach of a commission agreement. *See id.* at 3-8. The dealership moved to

-17-

compel arbitration under an arbitration agreement that specifically was referenced in the commission agreement and was reproduced on the reverse side of the commission agreement. *Id.* at 8, 21-32. Even though the court held that the first element of the two-element test was satisfied, it nonetheless held that a question of fact existed with respect to whether the plaintiff had assented to the arbitration agreement because of an ambiguity in the referencing language of the commission agreement. *Id.* at 27-32. Specifically, this ambiguity was that the commission agreement provided that the arbitration agreement was applicable only to nonunion employees, but no evidence had been offered to establish that the plaintiff was a nonunion employee. *Id.* at 28-29. Moreover, the court held that the mere fact that the plaintiff had a copy of the arbitration agreement and continued to accept commissions did not establish assent. *See id.* at 32.

Under the case law discussed above, defendant must establish, as a matter of law, both that the DAAD specifically was referenced in the EDA and that Accadia assented to the DAAD as a separate agreement. Questions of fact, however, exist for both of these elements. First and foremost, the EDA never specifically referenced the DAAD by its full title, which, again, is the "Deposit Account Agreement and Disclosure" (Panaro Reply Aff., Ex. C at 1, 2, 4, 7, 11 (¶¶ 1, 3, 8, 10, 12(a), 18, 33; Panaro Aff., Ex. C at 1)). Instead, like the rental agreement in *Chiacchia*, the terms of the EDA do not sufficiently refer to the DAAD because the only relevant provision of the EDA — paragraph 33 — generically refers to the "Customer's Deposit Agreement(s) with the Bank" (Panaro Reply Aff., Ex. C at 11). This reference is generic as opposed to specific because the word "Agreement" has an "s" in parenthesis (*id.*). Like the generic reference to "rules" in *Chiacchia*, the generic reference to "Agreement(s)" here establishes that the parties were not incorporating any specific agreement (*see id.*).

-18-

Furthermore, the ambiguity of this generic reference especially is apparent because the banking application that Accadia signed and that Ms. Panaro referenced as the point at which Accadia "became a commercial customer of" defendant specifically referenced the "Business Online Banking Agreement" as the agreement that Accadia had read and agreed to, but made no reference to the DAAD (Panaro Aff. ¶ 2; *id.*, Ex. A at 2 ("Authorization" section)). Thus, a reasonable interpretation of any generic reference to an "agreement" would be that the reference is to the "Business Online Banking Agreement" that Accadia acknowledged, signed, and agreed to when it opened its account. Moreover, paragraph 33 does not include the defined term that allegedly was given to the DAAD, which simply was the "Deposit Agreement" (*see* Panaro Reply Aff., Ex. C at 1, 11 (¶¶ 1, 33)). Therefore, like in *Chiacchia*, a question of fact exists because the terms of the EDA do not specify the DAAD.

More importantly, with respect to the second element, questions of fact exist with respect to whether Accadia assented to the DAAD. The majority of these factual issues were discussed in the previous section, and Accadia also will rely on those issues in support of its argument in this section (pp. 5- 16 supra). A question of fact, however, also exists for a reason analogous to the reason in *Torres*, which is that an ambiguity in the EDA casts uncertainty on whether it applies to Accadia's duties in reviewing and disputing withdrawals from its accounts. Specifically, the introductory paragraph at the top of the very first page of the EDA provides that the EDA "governs [Accadia's] use of the Express Deposit Service," which permits Accadia to make deposits electronically by transmitting electronically scanned images of checks to defendant (Panaro Reply Aff., Ex. C at 1). This language supports that the EDA should be

limited to the Express Deposit Service.[5]  Since Ms. Gramza's fraud that is the subject matter of this action did not arise out of this service, a question of fact exists with respect to whether the EDA — as well as whatever "agreement" allegedly was incorporated into it — apply to this action.  Therefore, like in *Torres*, questions of fact exist that preclude defendant from relying on the EDA to establish that the DAAD is enforceable in this action.

        B.        Even if the DAAD is Enforceable, This Action Cannot be Dismissed in Its Entirety Because Questions of Fact Exist With Respect to Whether Accadia's <u>Notice to Defendant was Sufficient</u>.

Even assuming, arguendo, that the 60-day limitations period under the DAAD is applicable, Accadia still has a viable cause of action for any wrongfully paid checks that occurred 60 days before Ms. Bodami — on behalf of Accadia — notified defendant because the DAAD does not require written notice.  Generally, ambiguities in a contract are construed against the drafting party.  *E.g., Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985).  Also, whether notice is sufficient as required under a contract often is a question of fact.  *Christiana Gen. Ins. Corp. v. Great Am. Ins. Co.*, 745 F. Supp. 150, 160 (S.D.N.Y. 1990); *U.S. Underwriters Ins. Co. v. Landau*, 679 F. Supp. 2d 330, 342, 344 (E.D.N.Y. 2010); *Pension Plan for Emples. of Battenfeld Grease & Oil Corp. v. Principal Mut. Life Ins. Co.*, 62 F. Supp. 2d 1055, 1061 (W.D.N.Y. 1999).

Here, any ambiguities in the DAAD must be construed against defendant because it drafted or, at least, allegedly "provided" the DAAD to Accadia (*see* Panaro Aff. ¶ 7).  The use of the term "notify" in the "Account Statements" paragraph is ambiguous because that term

---

[5]  Apparently, defendant expects this Court to again correct its mistake and to adopt its unilateral contention that the parties "really" intended for the EDA to govern all aspects of the accounts.

alone does not specify whether notice must be in writing (*id.*, Ex. C at 7).  Furthermore, this

ambiguity is exacerbated by the fact that several other parts of the DAAD do specify that written

notice is required, including for notice of inaccuracies in account statements that do not involve

fraudulent or unauthorized transactions (*id.*, Ex. C at 2, 5, 7 (paragraphs entitled "Withdrawal

Restrictions and Overdrafts continued," "Multiple-Party Accounts," "Account Statements,"

"Notices," "Account Termination").  Thus, the inclusion of a writing requirement in other parts

of the DAAD supports that the omission of this requirement for fraudulent or unauthorized

transactions was intentional.  With respect to the first time that Accadia notified defendant about

Ms. Gramza's fraud, this occurred in July of 2013 when Ms. Bodami called defendant (Pl.'s

App., Ex. C ¶¶ 2, 4-5).  Therefore, when construing the DAAD against defendant and resolving

all inferences or ambiguities in favor of Accadia, Ms. Bodami's phone call constituted sufficient

notice under the DAAD because the DAAD did not require written notice.


## POINT II

### ACCADIA'S ALLEGED NEGLIGENCE CANNOT BE A BASIS FOR SUMMARY JUDGMENT BECAUSE DEFENDANT HAS NOT ESTABLISHED THIS NEGLIGENCE OR THAT IT ACTED IN ACCORDANCE WITH "REASONABLE COMMERCIAL STANDARDS" AS A MATTER OF LAW.

Accadia's alleged negligence cannot be a basis for granting this motion because:

(1) whether Accadia was negligent is a question of fact that must be decided by a trier of fact and

(2) this alleged negligence does not preclude recovery if the bank failed to act in accordance with

the "reasonable commercial standards."  Whether a bank customer was negligent under section

3-406 has been held to constitute a question of fact. *Ernst & Co. v. Chem. Bank*, 209 A.D.2d

241, 245, 618 N.Y.S.2d 705, 708 (1st Dep't 1994); *Guardian Life Ins. Co. v. Chem. Bank*,

47 A.D.2d 608, 609, 363 N.Y.S.2d 820, 821 (1st Dep't 1975).  Moreover, a finding that a bank

customer acted in accordance with usual customs or practices in the customer's business or

industry can preclude a finding of negligence under section 3-406.  *Guardian Life Ins. Co.*,

47 A.D.2d at 609.  Also, even assuming, arguendo, that a bank customer was negligent, this

negligence does not preclude that customer from recovering for the bank's wrongful paying of an

instrument if the bank did not act in accordance with the "reasonable commercial standards" of

its business.  N.Y. U.C.C. § 3-406 (McKinney's 2016); *see also First Nat'l Bank v. Hovey*,

412 N.E.2d 889, 893 (1980) (section 3-406 is an affirmative defense that requires that the bank

establish that it acted in accordance with the "reasonable commercial standards" of its business).


Here, first and foremost, even assuming, arguendo, that Ms. Gramza was

authorized to use the signature stamp for Accadia's business,[6] defendant has presented no

substantive analysis supporting that this authorization fell below any standard of care.  More

specifically, defendant has not presented any evidence that it is unreasonable or otherwise

unusual for a business's bookkeeper or accountant to have access and to use a signature stamp.

Of course, if Mr. Marinaccio's personal bank account were at issue, the analysis may be

different.  Mr. Marinaccio's personal bank account, however, is not at issue, and, instead,

Accadia's business accounts are at issue, thereby making it completely reasonable for certain

individuals to have access to a signature stamp because Accadia is a corporation than can act

---

[6]  Defendant argues that the signature stamp was authorized for Accadia, but Mr. Marinaccio
testified that it was authorized only for another business that he — not Accadia — owned and for
which Ms. Gramza also was an employee (Pl.'s App., Ex. A at 29:11-12, 29:20-21).
Nevertheless, this fact is not relevant for the purposes of this motion because Ms. Gramza was an
employee of both businesses (*id.*).  Even if it were relevant, this issue is factual and thereby
prevents summary judgment because conflicting evidence has been presented on this issue.

only through its agents. In this respect, every reference in the DAAD to "your signature stamp," in fact, is referring to Accadia's signature stamp, as opposed to Mr. Marinaccio's.

Moreover, from an overall perspective, the evidence supports that Mr. Marinaccio acted reasonably with respect to withdrawals from Accadia's operating accounts because he personally "sat next to [Ms. Gramza] and signed all the checks . . . every week" (Pl.'s App., Ex. A at 28:9-10). Also, albeit not relevant to its motion, defendant's insinuation that Accadia was not diligent in reviewing its bank statements flatly is contradicted by the evidence because Mr. Marinaccio testified that Accadia's accountants reviewed these statements and reviewed Accadia's financials every quarter (id., Ex. A at 27:13-20). Also, after the bonding company had raised its concerns, Mr. Marinaccio had another accountant examine Accadia's records (id., Ex. A at 36:22-37:1) ("[w]e had hire[d] another accountant [a] couple weeks prior to this happen[ing] and brought him in, and he could find nothing"). Thus, if anything, Accadia was overly cautious by sending its bank statements to its accountants. Therefore, defendant has not presented evidence that establishes, as a matter of law, that Accadia was negligent.

Nevertheless, even assuming, arguendo, that Accadia was negligent, defendant has not offered any evidence that it acted in accordance with the standards and customs for commercial reasonableness in the banking industry.[7] First and foremost, the complaint includes the allegation that defendant "failed to follow commercial banking rules, regulations, standards, and customs" (Dkt. No. 1-2 ¶ 28). Moreover, the evidence buttresses this allegation because it supports that defendant repeatedly allowed Ms. Gramza to cash checks to herself for substantial

---

[7] Defendant's carelessness in this respect is consistent with its carelessness in account openings, which is discussed above in Point I.

sums of money without any notification — which could be as simple as a phone call — to

Mr. Marinaccio (*see* Panaro Aff., Ex. G).  Additionally, Ms. Gramza cashed multiple checks per

week; for example, in the first week of April, 2013, Ms. Gramza cashed over $7,000 of checks to

herself (*id.*, Ex. G at 322-25).[8]  Also, Ms. Gramza's conduct especially was suspicious because

she was cashing checks to herself from Accadia's operating account as opposed to its payroll

account, from which payments to Ms. Gramza would be expected to be drawn because she was

an employee of Accadia (*see id.* ¶¶ 17-18; *id.*, Exs. E, F).


In sum, even though Ms. Panaro has submitted two affidavits in this action and

defendant has had every opportunity, it has not presented any evidence that it acted reasonably

when it repeatedly allowed Ms. Gramza to cash these checks.  Moreover, the mere fact that Ms.

Gramza was designated as a "CSA" does not have any relevance on this issue because that

designation provided her only with full rights to electronically access Accadia's accounts (*see*

Panaro Aff., Ex. A at 1).  In fact, the CSA's rights to pay bills was conditioned on the "type of

access it has designated for the accounts," and Ms. Gramza's access was limited to making

transfers and electronically paying bills through the Automated Clearing House ("ACH")

network (*id.*).  Thus, Ms. Gramza's designation as a "CSA" did not provide her with the

unfettered permission to cash checks or make withdrawals in person from Accadia's accounts

(*see id.*).  Furthermore, unlike the case that defendant cites — *Josephs v. Bank of N.Y.*,

302 A.D.2d 318, 318-19 (1st Dep't 2003) — defendant has not produced any agreement that

gave Ms. Gramza unfettered authority to cash checks or make withdrawals from Accadia's

---

[8]  It also should be noted that the checks from this week each apparently have the same initials
superimposed on them (Panaro Aff., Ex. G at 322-25).  Whether these initials are from the same
teller or whether Ms. Gramza was using the same teller are issues that pertain to defendant's use
of ordinary care and cannot be resolved on this motion.

account.  Therefore, defendant is not entitled to summary judgment on the ground of section 3-406 because it has not established as a matter of law either that Accadia was negligent or that defendant followed the "reasonable commercial standards" of the banking industry.[9]

## CONCLUSION

In sum, simply too many questions of fact exist that preclude summary judgment, including the following:  whether the DAAD is enforceable when the evidence supports that Accadia did not assent to the DAAD; whether Accadia's notice was sufficient when the DAAD does not unambiguously require written notice; whether Accadia was negligent; and whether defendant complied with the standards and customs for commercial reasonableness in the banking industry.  Therefore, this Court should deny defendant's motion for summary judgment.

Dated: July 22, 2016
Buffalo, New York

RUPP BAASE PFALZGRAF CUNNINGHAM LLC
Attorneys for Plaintiff

By: _____
R. Anthony Rupp III, Esq.
1600 Liberty Building
Buffalo, New York 14202-3694
(716) 854-3400 (P)
rupp@ruppbaase.com

_____

[9]  Defendant also argues that the corporate resolution and the "Withdrawal Restrictions and Overdrafts" provision of the DAAD completely absolves it of any liability for honoring any instrument bearing Mr. Marinaccio's signature.  Defendant, however, does not connect this argument to any ground that entitles it to summary judgment, and this argument, in fact, is not relevant to this motion.  Nevertheless, even assuming, arguendo, that Accadia did assent to these documents — which it did not — the cited provisions are not enforceable as a matter of law because they violate section 4-103 of the UCC.  *See* N.Y. U.C.C. § 4-103 (McKinney's 2016) ("no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care"); *Clemente Bros. Contr. Corp. v. Hafner-Milazzo*, 23 N.Y.3d 277, 287, 991 N.Y.S.2d 14, 19 (2014).